IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Alexandria Division*

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Case No. 1:15-CR-124 |
| v.    ) | |
| ) | Hon. T.S. Ellis, III |
| SOHAIB AKHTER, ) | |
| ) | Hearing Date: September 11, 2020 |
| Defendant.    ) | |

**GOVERNMENT'S POSITION ON SUPERVISED RELEASE VIOLATION**

The United States of America, pursuant to 18 U.S.C. § 3583 and Federal Rule of Criminal Procedure 32.1, hereby submits this memorandum regarding the violations of supervised release committed by the defendant, Sohaib Akhter. As alleged in the fifth petition, including the first and second addenda, the defendant violated a mandatory condition of his supervised release by committing new crimes related to the theft of two different vehicles by submitting fraudulent documents to the Virginia Department of Motor Vehicles. In both instances, the defendant utilized Virginia's Abandoned Vehicle Process in order to take possession of vehicles that were not abandoned. In one instance, after fraudulently registering a stolen vehicle to himself, he then sold the vehicle to another individual for $8,500.

For the reasons set forth below, the United States respectfully requests that the Court find the defendant in violation of the conditions of his supervised release, revoke his supervised release, and sentence the defendant to four months of imprisonment. The government recommends the Court not impose a new term of supervised release.

1

## BACKGROUND

**A.     The Underlying Conviction**

On June 26, 2015, the defendant pleaded guilty to conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349 (Count One); conspiracy to access a protected computer without authorization, in violation of 18 U.S.C. §§ 1030(a)(2)(C) and (c)(2)(B)(i)-(iii) and 371 (Count Two); and conspiracy to access a government computer without authorization, in violation of 18 U.S.C. §§ 1030(a)(2)(B) and (c)(2)(B)(i)-(iii) and 371. Dkt. No. 50. The defendant and his co-conspirator, the defendant's twin brother Muneeb, stole credit card information from customers of an online retailer. The defendant and his co-conspirators then used the stolen information to make purchases from a multitude of vendors located around the United States and abroad. *See* Statement of Facts ¶¶ 2–3 (Dkt. No. 52).

In addition, the defendant worked as a contractor at the U.S. Department of State ("Department"). *Id.* ¶ 31. The defendant used his position as a contractor to search for, access, and ultimately copy, sensitive passport information belonging to coworkers, acquaintances, a former employer, and federal agents investigating the defendant. *Id.* ¶ 32. The defendant also surreptitiously installed malicious programs onto Department computer systems to allow the defendant to access passport applications and unilaterally approve visa applications without Department authorization. *Id.* ¶¶ 43-45. The defendant also led the conspiracy to install a physical device in a Department facility to enable the defendant and his co-conspirators to collect data from Department computers and transmit it wirelessly to computers controlled by the defendant and his co-conspirators. *Id.* ¶¶ 46-48.

On October 2, 2015, the Court sentenced the defendant to 24 months' imprisonment followed by three years of supervised release with special conditions, and ordered the defendant to pay $31,375.55 in restitution. Dkt. No. 80. On October 10, 2017, the defendant was released from the Bureau of Prisons, at which time his term of supervised release commenced.

**B.    Previous Violations of Supervised Release and Related Conduct**

    **i.    First Petition**

The defendant's supervised release began on October 11, 2017. On that date, the defendant met with his probation officer to review the conditions of his supervised release. At that time, as well as on October 16, 2017, the defendant was informed that he was prohibited from possessing or accessing a computer device with internet capabilities absent approved monitoring software. Nevertheless, the defendant used his cell phone prior to the installation of computer monitoring software.

On November 1, 2017, the defendant was directed not to install software or applications on his device without prior approval from the probation officer. The defendant was further directed to install only one program at a time after obtaining approval from the probation officer. On April 16, 2018, however, the monitoring software company informed the probation officer that the defendant had installed several software programs and applications on his devices. The defendant did so without notifying or receiving approval from the probation officer. Additionally, on April 20, 2018, the defendant advised his probation officer of a new program he had already installed, rather than notifying before installing, per the explicit instructions provided on multiple occasions. On December 18, 2017, during a scheduled home visit, the probation officer noticed an unmonitored gaming device that could act as a computer device. Because the defendant was prohibited from possessing computer devices without monitoring software, the probation officer

directed the defendant to have his grandmother take possession of the device. The probation officer also discussed other similar prohibited gaming devices with the defendant at that time.

On February 7, 2018, and February 22, 2018, the probation officer reviewed the defendant's monitoring conditions with him in an effort to ensure the defendant understood what was expected of him. The probation officer provided a written set of specific instructions for the defendant to follow to mitigate further monitoring issues, and the defendant signed those instructions indicating he had reviewed the document.

On February 12, 2018, the monitoring software company instructed the defendant to use only Chrome to access the internet, as the company believed other browsers were impacting the monitoring software. On February 28, 2018, it was discovered that the defendant not only reinstalled a separate browser, but also continued to use that browser (and not Chrome) on at least four dates, contrary to the instructions provided by the monitoring software company.

On March 26, 2018, the defendant notified his probation officer that he had reset his cell phone after allowing a third party to possess his phone, which removed the monitoring software in violation of his computer monitoring agreement. The incident occurred after the defendant was warned on three prior occasions about having a third party access or possess his cell phone.

On April 20, 2018, the defendant was informed his computer was in non-reporting status and was directed to report to his probation officer. On April 23, 2018, as a result of the meeting, the probation officer learned the defendant had continued to possess his unmonitored gaming device and had failed to surrender the device to his grandmother as previously directed and agreed upon on in December 2017. Also on April 23, 2018, the defendant was instructed to provide weekly job search logs. The defendant chose to submit these logs each Friday. The following Friday, however, the defendant failed to submit his employment log to his probation officer. On June 22, 2018, the Court found the defendant in violation of supervised release and sentenced him

4

to serve two weekends of confinement and directed him to comply with mental health counseling. Supervised release was continued.

### ii. Second Petition

On October 19, 2018, the defendant was sanctioned for participating in a scheme to introduce a prohibited device into the prison facility where his brother was incarcerated. This Court sentenced him to six weekends of confinement and modified the conditions of his supervised release to give the probation officer greater visibility into the defendant's use of technology and related conduct.

### iii. Third Petition

On January 2, 2018, the probation officer filed a third petition, alleging that the defendant failed to comply with his mental health treatment plan and that he was found in possession of an unauthorized device from his current employer. The defendant missed a total of three scheduled meetings with his mental health counselor in November and December of 2018. The probation officer met with the defendant and his employer to discuss the unauthorized device, which had been given to the defendant for telework purposes, and reiterated the terms of supervision as well as the seriousness of these obligations. This Court ordered the defendant to serve the remainder of the day in the custody of the United States Marshal's Service and continued the defendant on his current term of supervised release.

### iv. Fourth Petition

Probation Officer Frank Weaver of the Eastern District of Virginia filed the fourth petition on April 19, 2019. Dkt. No. 231. The petition alleged that the defendant violated three separate conditions: (1) leaving the judicial district without permission; (2) using an unauthorized computer without prior approval from the probation officer; and (3) possessing an unmonitored, internet-capable cell phone. *Id.*

Officer Weaver was made aware of the violations by Maryland State Police. The defendant left the Eastern District of Virginia and traveled to the Motor Vehicle Administration (MVA) in Maryland in an effort to obtain new identification documents. Maryland State Police advised that the defendant was caught in possession of several false identification documents, including a fraudulent driver's license, a fraudulent social security card, and a fraudulent birth certificate. He also was in possession of multiple credit cards that were not in the defendant's name, two Subscriber Identification Module (SIM) cards[1], and two internet-capable cell phones. When questioned by authorities, the defendant stated that he used one cell phone to communicate with his probation officer and the other cell phone to conduct unmonitored activities. The defendant later admitted the same to Officer Weaver. The defendant advised Officer Weaver that he traveled to the Maryland MVA in order to obtain a Maryland identification card that he could use to circumvent any background checks conducted by potential new employers. He also advised Officer Weaver that he obtained the false documents he presented to MVA by using a public computer at a local shopping mall.

At his revocation hearing on May 10, 2019, the defendant told the Court that he committed identity theft and fraud only because he was embarrassed about his criminal past and sought to start over with a new identity and new job, despite having been employed at the time. The Court revoked the defendant's supervised release, sentenced the defendant to 30 days in confinement with credit for time served, and imposed an additional year of supervised release, which expired on May 26, 2020.

---

[1] A SIM card is an integrated circuit intended to securely store information. It can be used as backup storage to conceal activities on cellular devices such as text messages and phone calls.

**C.     Current Violations**

Probation Officer Frank Weaver filed the instant petition on May 5, 2020. Dkt. No. 281. The petition alleges that the defendant violated a mandatory condition of his supervised release by committing a crime, specifically, that the defendant was charged in Arlington County with Threat: To Extort Money and Grand Larceny: Motor Vehicle Theft.  The petition explains that the defendant was being investigated by Arlington County Police Department for possible vehicle theft from Avis, a rental car company.  On May 15, 2020, Officer Weaver submitted an addendum to the petition in order to clarify that the charges in Arlington County had been amended to reflect one felony charge of Alter, Forge Vehicle Registration or Title.  Dkt. No. 284.  On May 19, 2020, Officer Weaver submitted a second addendum to the petition in order to inform the Court that on May 14, 2020, the defendant was charged with five felony counts in Fairfax County by the Virginia Department of Motor Vehicles related to the theft of a second vehicle. Dkt. No. 285.  The charges include Obtaining Money by False Pretenses, Obtaining Documents Not Entitled To, Forgery or Uttering, and two counts of Perjury.  On July 15, 2020, the Commonwealth of Virginia dismissed the Arlington County charge for lack of venue. On September 1, 2020, the proceedings in Fairfax County were continued until January 6, 2021.

It is unclear how the defendant first came into possession of the two vehicles that he eventually claimed were his.  In both cases, the defendant sought to use Virginia's Abandoned Vehicle Process to claim ownership of two vehicles that did not and could not legally belong to him.[2]

---

[2] Virginia's Abandoned Vehicle Process allows eligible individuals, businesses, and government agencies in possession of an abandoned vehicle to apply for the title of the vehicle (or otherwise sell it or demolish it) if certain statutory requirements are met, including that the person in possession of the vehicle request by certified mail that the current out-of-state owner or lienholder remove the vehicle within 15 days of the request.  If there is no response to the removal request, then the person seeking the vehicle must post his or her intention to auction the vehicle on the DMV website for 21 days.  *See* www.dmv.virginia.gov/vehicles/#abandoned (last

### i.    Fairfax Charges

On April 29, 2020, according to a DMV incident report, the general manager of a Toyota dealership in Chantilly, Virginia contacted the Virginia Department of Motor Vehicles ("DMV") seeking assistance regarding a missing vehicle. Gov. Ex. 1. The general manager reported that he purchased a Toyota Camry in January 2020 from a wholesaler located in Rockville, Maryland for $14,900. *Id.* The Camry was to be delivered shortly thereafter to the dealership in Chantilly. On February 5, 2020, the general manager realized that the Camry had not been delivered. *Id.* The general manager explained to the DMV that the vehicle originally was titled in Illinois and that Toyota is the original lienholder. *Id.* Through his own search, the general manager discovered that another individual, herein referred to as "A.M.," recently titled and registered the vehicle in Virginia after purchasing the vehicle from the defendant, who first titled the vehicle in Virginia under his own name in February 2020. *Id.*

Further investigation revealed that the defendant began the process of stealing the vehicle in December 2019. On December 9, 2019, the defendant submitted to the Virginia DMV a request for the records of an allegedly abandoned 2017 Toyota Camry. Gov. Ex. 2. According to responsive records, the search of the National Motor Vehicle Titling Information System ("NMVTIS") found that the 2017 Toyota Camry was titled in Illinois. *Id.* The Abandoned Vehicle Process would next require the defendant to contact Illinois to request the information of the vehicle's owner or lienholder. On December 11, 2019, the defendant sent a letter to the Secretary of State of Illinois requesting the vehicle owner's information and mailing address. Gov. Ex. 3. On January 21, 2020, the defendant submitted an Information Request Form to the Secretary of State of Illinois requesting the owner information of the 2017 Toyota Camry. Gov. Ex. 4. The

---

visited Sept. 9, 2020); Va. Code Ann. § 46.2-1202 (1950).

information provided by the defendant on the form included the VIN of the stolen Camry. *Id*. On January 29, 2020, in response to the defendant's letter from December 11, 2019, the Office of the Secretary of State of Illinois sent the defendant a letter explaining that privacy laws prevented the office from providing the requested information. Gov. Ex. 3 at 2. However, as evidenced by the documents the defendant submitted to the Virginia DMV in February 2020, the Secretary of State of Illinois eventually provided the requested information to the defendant in response to the Information Request Form he submitted on January 21, 2020. Gov. Ex. 5.

The defendant then sent a number of pieces of certified mail to different individuals or entities associated with the Camry so that he could later claim to have satisfied the notice requirements of Virginia's Abandoned Vehicle Process. Gov. Ex. 6. On January 28, 2020, the defendant sent a piece of certified mail to Toyota Lease Trust in Atlanta, Georgia. Gov. Ex. 6 at 1. The same day, the defendant sent a piece of certified mail to an individual herein referred to as "C.B.," in Illinois. Gov. Ex. 6 at 2. Records indicate that C.B. once leased the Camry from Toyota Lease Trust. Gov. Ex. 5. A domestic return receipt suggests that C.B. signed for the piece of certified mail on February 6, 2020, but law enforcement has been unable to verify the authenticity of the document. Gov. Ex. 6 at 3. On February 4, 2020, the defendant sent a second piece of certified mail to C.B. Gov. Ex. 6 at 4. There is no indication that that the mail was received as the defendant did not submit a return receipt to the Virginia DMV for that piece of mail as he did for a number of others.

On February 20, 2020, the defendant submitted to the Virginia DMV an application for a certificate of title and registration for the Toyota Camry (Gov. Ex. 7) as well as a vehicle removal certificate. Gov. Ex. 8. In the title and registration application, the defendant provided the VIN of the Camry that was missing from the Toyota dealership in Chantilly. Gov. Ex. 7. The defendant claimed on the form to have purchased the Camry from C.B. on December 15, 2019, for $4,000.

9

*Id*. The defendant submitted numerous documents to the DMV along with the application for title and registration and the vehicle removal certificate, including the report from the Virginia DMV regarding the Abandoned Vehicle Process (Gov. Ex. 2), the odometer statement of the Camry from the State of Illinois (Gov. Ex. 9), a certificate of origin of the vehicle (Gov. Ex. 5), and records related to the shipment and delivery of various pieces of certified mail sent by the defendant to individuals associated with the vehicle (Gov. Ex.6), among other documents.

On February 27, 2020, the defendant and A.M. visited the Virginia DMV Customer Service Center located in Lorton, Virginia, and transferred the title and registration from the defendant to A.M. Gov. Ex. 10. On May 11, 2020, A.M. met with a special agent with the Virginia DMV at A.M.'s residence in Fairfax, Virginia. Gov. Ex. 1. A.M. confirmed that the defendant sold him the Camry for $8,500, which was present at his residence that day. *Id.* A.M. claims to have paid the defendant $4,000 as a deposit for the vehicle with a plan to pay $500 every month until the full amount was satisfied. *Id.* A.M. told the special agent that he did not know that the defendant did not own the vehicle. *Id*. The defendant told A.M. that the defendant purchased the vehicle from an online auction and that he sold cars as a part-time business. *Id.* On May 14, 2020, the defendant was charged in Fairfax County with five felony counts related to submitting fraudulent documents to the Virginia DMV.

    **ii.**     **Arlington Charges**

On April 27, 2020, the defendant was charged in Arlington County with Threat: To Extort Money and Grand Larceny: Motor Vehicle Theft in connection with possible vehicle theft from Avis. The charges were later amended to reflect one felony charge of Alter, Forge Vehicle Registration or Title. On July 15, 2020, the charge was dismissed due to do lack of venue as there was no evidence that the defendant committed the crime in Arlington County. The following

summary of the defendant's offense was taken from the Arlington County Police Department case report. Gov. Ex. 11.

On March 17, 2020, an Avis employee contacted Arlington County Police Department to report a stolen Dodge Charger. According to Avis employees, the car was last seen in the Fashion Centre Parking Garage in Arlington, Virginia on December 30, 2020. The employee stated that at some point in the last month, Avis received a note demanding $1,500 for the return of the stolen Dodge Charger. The return address on the letter's envelope was the defendant's address in Springfield, Virginia. On January 30, 2020, after confirming that the Charger was not rented out to a customer but that the keys were missing, an Avis employee informed an Avis Security Specialist of the missing car.

On March 18, 2020, the Avis Security Specialist met with law enforcement and explained that two days prior, a certified letter was received at the New York office of the parent company of Avis. The letter did not provide identifying information of the vehicle at issue, but asserted that the writer intended to keep a vehicle belonging to Avis. The return address on the letter's envelope was the defendant's address in Fairfax County. The Avis Security Specialist visited the defendant's address on March 16, 2020, and observed a black Dodge Charger in the driveway, with Avis barcodes mostly removed, and a VIN number that matched that of the missing Dodge Charger. The Avis Security Specialist spoke with the defendant that day, who claimed that after the vehicle was parked in front of his residence on the street, the defendant called a locksmith to cut new keys for him at which point he moved the car to his driveway and affixed tags belonging to a different vehicle of his. The Avis Security Specialist offered to reimburse the defendant for the keys but the defendant said that he intended to keep the vehicle.

On March 20, 2020, law enforcement spoke with the defendant at his residence. The defendant repeated the story he told the Avis Security Specialist, adding that he sent a certified

letter to the New York DMV on January 13, 2020. He also claimed that he assumed the Dodge Charger was on his property because it was parked on the street outside of his house. He again claimed to have a locksmith cut new keys for the car. The law enforcement offer did not observe the car at the residence. The defendant first told law enforcement that the car was in the shop but eventually admitted that it was at a friend's house in Herndon because he thought the Avis Security Specialist might return to tow the car.

## ANALYSIS

### A.    Legal Standard

Supervised release revocation hearings are not formal trials, and the Federal Rules of Evidence need not be strictly observed. Fed. R. Evid. 1101(d)(3); *United States v. Cates*, 402 F.2d 473, 474 (4th Cir. 1968) (per curiam). A court need only find by a preponderance of the evidence that the defendant violated a requisite condition to support a revocation order. 18 U.S.C. § 3583(e)(3); *United States v. Copley*, 978 F.2d 829, 831 (4th Cir. 1992).

Upon revocation, a court may impose a term of imprisonment equal to all or part of the supervised release term authorized by statute, without credit for time previously served. 18 U.S.C. § 3583(e)(3). In addition, a court may impose another period of supervised release, the length of which shall not exceed the term of supervised release authorized by statute for the offense that resulted in the original term of supervised release, less any term of imprisonment that was imposed upon revocation of supervised release. 18 U.S.C. § 3583(h). If a court does not revoke supervised release, the court may continue, modify, or terminate a term of supervised release. 18 U.S.C. § 3583(e)(1)–(2).

Before revoking or modifying a term of supervised release, courts are to consider the history and characteristics of the defendant, the nature and circumstances of the offense, and all other § 3553(a) sentencing factors, with the exception of the seriousness-of-the-offense factor set

forth at § 3553(a)(2)(A). 18 U.S.C. § 3583(e). Such factors include the need for the sentence to provide adequate deterrence to the defendant and to protect the public from the defendant's future criminal conduct, among other factors. *See* 18 U.S.C. § 3553(a)(2)(B) and (C), (a)(4)–(7).

As relevant here, a court may revoke a term of supervised release after the supervised release term expires "if, before its expiration, a warrant or summons has been issued on the basis of an allegation of an allegation of such a violation." 18 U.S.C. § 3583(i). *See United States v. Barton*, 26 F.3d 490, 491 (4th Cir. 1994) (Courts retain jurisdiction to hold hearings related to revocation of supervised release for a reasonable period after the term of release expires when a petition charging a violation of the conditions of supervised release is filed during the period of supervised release).

**B.     Statutory and Guidelines Analysis**

The defendant's underlying offenses include conspiracies to commit wire fraud, access a protected computer without authorization, and access a government computer without authorization, in violation of 18 U.S.C. §§ 371 and 1349. Therefore, if the Court determines by a preponderance of the evidence that the defendant violated the terms of his supervised release, it may revoke the supervised release authorized for the underlying offense and impose a term of imprisonment of up to two years. 18 U.S.C. § 3583(e)(3).

The United States Sentencing Guidelines ("U.S.S.G.") provide non-binding policy statements for supervised release violations, including recommended ranges of imprisonment for supervised release violations based upon the defendant's criminal history category and the nature of the violation. U.S.S.G. § 7B1.4. Under the guidelines, "the grade of the violation is determined by the violation having the most serious grade." *Id.* § 7B1.1(b). The defendant's actions constitute Grade C violations. *See id.* § 7B1.1(a)(3). At the time of his sentencing, the defendant's criminal history was Category I. Thus, if the Court revokes the defendant's

supervised release and imposes a period of incarceration, the guidelines recommend a term of imprisonment of three to nine months. *Id.* § 7B1.4(a).

If the Court does revokes the defendant's supervised release and imposes a term of imprisonment, it also may impose an additional term of supervised release following the term of imprisonment. 18 U.S.C. § 3583(h). Because the maximum term of supervised release for the underlying conviction is three years, the maximum additional term of supervised release the Court may impose upon revocation is three years, less any term of imprisonment imposed upon revocation. *Id.; see United States v. Sanchez*, 891 F.3d 535, 540 (4th Cir. 2018) ("[W]hen a new term of supervised release is imposed 'after imprisonment' upon revocation, that term 'shall not exceed the term of supervised release authorized by statute for the offense that resulted in the original term of supervised release, less any term of imprisonment that was imposed upon revocation.'" "[T]he plain meaning of the phrase 'less any term of imprisonment that was imposed upon revocation of supervised release' . . . is that the prison term in the current revocation sentence, together with all prison time imposed under any prior revocation sentence or sentences, must be aggregated." *United States v. Maxwell*, 285 F.3d 336, 341 (4th Cir. 2002).

In this case, the Court imposed a sentence of two weekends of confinement after the first violation, six weekends of confinement after the second violation, one day in the custody of the U.S. Marshals after the third violation, and 30 days of confinement with credit for time served after the fourth violation, for a total of 47 days. Section 3583(h) thus authorizes the court to impose a supervised release term of no more than two years, 10 months, and 13 days, less any term of imprisonment imposed.

## RECOMMENDATION

The United States respectfully requests that the Court find the defendant in violation of the conditions of his supervised release, revoke his supervised release, and sentence the defendant to four months of imprisonment. The government recommends the Court not impose a new term of supervised release.

A meaningful period of incarceration is appropriate in this case. First, a four-month term of incarceration would help "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). The defendant continues to victimize the public, even while under supervision, despite having been sanctioned by the Court on multiple occasions. In the underlying offense, the defendant used stolen credit card information to make more than $30,000 in fraudulent purchases from approximately 20 companies. Just last year, in April 2019, the defendant stole the identity of an individual and then used the stolen identity in an attempt to secure a valid Maryland identification card in that person's name. In this instance, the defendant claimed ownership of a Dodge Charger that belonged to a rental car company, causing the company to spend months attempting to recover it. He also claimed ownership of a Toyota Camry that belonged to a dealership. He then sold the stolen Camry to A.M. for $8,500. A.M. paid the defendant $4,000 up front for the Camry and then paid approximately $700 to Virginia for taxes and fees associated with registering the vehicle, only for the Camry to be recovered by the dealership that actually owned it. Once again, as in the underlying offense and the conduct associated with his prior violations, the defendant used the internet to accomplish his scheme to defraud both the DMV and A.M. and to harm two different businesses. Because the defendant continues to victimize others even while under supervision, a period of incarceration is necessary to protect the public from further crimes by the defendant.

Second, a meaningful period of incarceration is necessary to "afford adequate deterrence to criminal conduct," *id*. § 3553(a)(2)(B), as the leniency shown by this Court in dealing with the previous four petitions has not been sufficient to deter the defendant from violating the terms of his supervised release by committing crimes. The first petition filed in May 2018 showed that the defendant used unmonitored devices, installed programs and software on a cell phone (even after the defendant had been warned and reprimanded not to do so by his probation officer), and used unauthorized browsers on his cell phone after the computer monitoring program directed him not to do exactly that. He also failed to submit weekly job search logs. For those violations, he was sentenced to two weekends in jail. In September 2018, his probation officer filed a second petition that detailed the defendant's incredible efforts to circumvent Federal law and internal processes of the Bureau of Prisons in order to send an altered MP3 player to his brother in a Bureau of Prisons facility. The Court sentenced the defendant to six weekends in jail for that violation. The third petition, filed in January of 2019, described the defendant's failure to attend multiple treatment appointments and his use of an unauthorized, unmonitored work laptop at home. The Court sentenced him to the remainder of the day in jail for those violations. In April 2019, a fourth petition detailed egregious violations by the defendant related to aggravated identity theft and fraud. The defendant used unmonitored computers to amass multiple fraudulent documents so that he could deceive a government entity for the purpose of obtaining a new identification document that would not be linked to his criminal history. The Court sentenced the defendant to 30 days of confinement with credit for time served for that violation.

At the defendant's last hearing before this Court in May 2019, he said that he only committed aggravated identity theft and fraud so that he could get out from under his criminal history. This Court told the defendant that he cannot hide his criminal history and that the way to get beyond his criminal past is to stop committing crimes. Despite the Court's admonitions, the

defendant decided to continue engaging in criminal conduct. The scheme at issue is complicated. It took time to accomplish it. At every step of the process, the defendant lied and misled others. He deceived government agencies and made misrepresentations to law enforcement. This was not a one-time slip up. It was a carefully orchestrated plan to get multiple cars that he did not legally buy and to make money he did not legally earn. In light of the defendant's previous lenient sentences and continued criminal conduct, a significant sentence of imprisonment is necessary to have a deterrent effect.

Finally, a meaningful period of incarceration is appropriate in light of "the nature and circumstances of the offense and the history and characteristics of the defendant." *id.* § 3553(a)(1). The defendant's conduct while on supervised release, and his efforts to explain some of it, would be unbelievable if it not for his long criminal history and proclivity for using his skills and knowledge to game the system. From the very beginning, the defendant has refused to accept that he is subject to the law and the rulings of this Court. This is the fifth petition alleging violations of supervised release on the part of the defendant since the original term of his supervised release began in October 2017. Even prior to his release from custody, the defendant was caught on two separate occasions with unmonitored devices. The first petition filed in relation to the defendant in May 2018 alleged that he began violating the terms of his supervised release immediately upon his release from federal custody.

The current violations confirm that the defendant thinks that he is above the law. The defendant has a history of justifying his criminal behavior by providing seemingly innocent motives and then pleading for leniency. Despite what the defendant has claimed in the past and what he might claim in regard to the conduct at issue, his actions demonstrate that he does not care what this Court has to say or what the law requires. The offenses committed by the defendant are not simply matters of paperwork in which there were no victims. Rather, the defendant took

17

incredibly deliberate steps and engaged in meticulous planning to accomplish what amounts to the theft of two cars worth tens of thousands of dollars. The deceitful nature of the crimes at issue is consistent with the defendant's criminal history and reflects a shocking willingness by the defendant to take advantage of innocent third parties. The defendant repeatedly uses deception to mislead others and to take things that do not belong to him. This pattern warrants a meaningful sentence of imprisonment.

In addition to the commission of new crimes, this investigation revealed that the defendant has violated additional terms of his supervised release not described in the instant petition. Phone records obtained as part of the Arlington County investigation show that the defendant was regularly using an unapproved cell phone that he did not report to his probation officer. The records also show that he was in regular contact with a number registered to his brother, Muneeb Akhter, with whom he is expressly prohibited from having contact by the terms of his supervised release.

The defendant has chosen to continue to engage in serious criminal behavior despite numerous opportunities for a fresh start afforded by this Court. His defiance of the law and the orders of the Court, in such a brazen manner, evince a commitment to crime that will not soon end. In this case, supervised release has not been an effective means of reducing recidivism or reintegrating the defendant into the community. Therefore, the United States recommends the Court impose a four-month term of imprisonment without any new term of supervised release.

## CONCLUSION

For the forgoing reasons, the United States respectfully recommends a Guidelines sentence of four months.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

                /s/
Rachael C. Tucker
Special Assistant United States Attorney
Nathaniel Smith III
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia  22314
Phone: (703) 299-3700

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 10, 2020, I caused a copy of the foregoing memorandum to be filed with the Clerk of Court using the CM/ECF system, which will automatically generate a Notice of Electronic Filing (NEF) to counsel of record.

/s/
Rachael C. Tucker
Special Assistant United States Attorney